**Mrs. Claude Emmett PHELPS, Individually and as widow of Claude Emmett Phelps, Plaintiff-Appellant,**

v.

**VANDERBILT UNIVERSITY, Defendant-Appellee.**

Court of Appeals of Tennessee, Middle Section.

July 26, 1974.

Certiorari Denied by Supreme Court Feb. 3, 1975.

John W. Nolan, III, Lester, Hildebrand, Nolan, Lane Underhill, Mondelli, Flynn & Porter, J. L. Thompson, III, Nashville, for plaintiff-appellant.

Frank C. Gorrell, Bass, Berry & Sims, Nashville, for defendant-appellee.

## OPINION

SCHRIVER, Presiding Judge.

In this cause the widow of Claude Emmett Phelps, who died on September 26, 1968, seeks to recover damages for the wrongful death of her husband on the ground that his death resulted from, or was proximately contributed to, by the negligence of the doctor who waited on him and who was an agent and employee of the defendant, Vanderbilt University.

The suit was originally brought against Doctor Steven Allen Butler and Van-derbilt University but, subsequently, on motion of plaintiff, a non-suit as to Doctor Butler was granted by order entered January 12, 1970.

The cause was heard in the Circuit Court of Davidson County before Honorable Joe C. Loser, Judge, and a jury, and at the conclusion of the evidence offered by plaintiff, defendant moved the Court for a directed verdict in its favor, which was taken under advisement. Thereafter, when the defendant chose to stand on its motion and not to introduce proof, the Court entered the following order:

## "ORDER

This cause came on to be heard on the 5th day of November, 1973, and on previous days, before the Honorable Joe C. Loser, Judge, and a jury of men and women who were respited from day to day. At the conclusion of all of the evidence to be introduced in this cause, the defendant moved the Court for a directed verdict, and after argument of counsel and after consideration of the entire record in this cause, the Court finds that the motion is well taken and should be sustained.

IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED that the motion for directed verdict be and the same is hereby sustained and this cause be and the same is hereby DISMISSED at the cost of the plaintiff, for which execution may issue, if necessary.

/s/ Joe C. Loser
_____
JUDGE

Enter this 9th day of November, 1973.

APPROVED FOR ENTRY:

/s/ Jno. W. Nolan, III
_____
Attorneys for Plaintiff, Mrs. Claude Emmett Phelps

/s/ Frank C. Gorrell
_____
Attorney for Defendant, Vanderbilt University"

From this decree the plaintiff was granted and perfected her appeal to this Court and has assigned a single error.

## ASSIGNMENT OF ERROR

"The Trial Court erred in directing a verdict for the defendant in this cause and in failing to submit the case to the jury for a decision."

## THE FACTS

The essential facts as set forth in plaintiff's declaration and substantiated by proof may be summarized as follows:

Plaintiff is the widow of Claude Emmett Phelps who was injured on September 24, 1968 when, as a pedestrian, he was struck by a truck belonging to the Murfreesboro Freight Line Company while walking along Fourth Avenue South in Nashville, Davidson County, Tennessee. He was thrown to the ground and was taken by ambulance to the Nashville General Hospital, which is operated by the Metropolitan Government of Nashville and Davidson County.

It is alleged and shown that defendant, Vanderbilt University, has a contract with the Metropolitan Government by which the Medical School of defendant furnishes resident and staff physicians for said Nashville General Hospital. Steven Allen Butler was assigned by the defendant's Medical School to duties as a resident physician at the Nashville General Hospital and was on duty in the Emergency Room of said hospital when plaintiff's husband arrived there in the late afternoon of September 24, 1968.

It is alleged and shown that Doctor Butler made an examination of the injuries sustained by Claude Emmett Phelps and prescribed certain treatment for him. He caused X-rays to be made of the patient's lower back and spine and, after examining said X-rays and administering some drugs to relieve pain that the patient complained about, he told the family that they might take the patient home, giving them instructions as to his treatment.

On examining the X-rays with his attention focused chiefly on the lower spine and lumbar region where the patient complained of pain, he failed to discover certain fractures of the pelvic bone. On the following morning he followed the customary routine of having the X-rays examined by a radiologist, when the fractures of the pelvic bone were discovered and, thereupon, the family of Mr. Phelps were notified that the patient should be brought back immediately to the hospital. Upon being returned to the hospital on September 25th, he was given additional medication and kept confined to his bed, but on the morning of September 26th, 1968 he died.

The chart at the hospital showed that his death occurred at 5:40 A.M. on September 26th, and that his death was due to cardiorespiratorial arrest caused by aspiration.

An autopsy was performed by the Department of Pathology at Nashville General Hospital and it revealed that the deceased had fat emboli, bone marrow and clots in some of the organs of his body, particularly, in his lungs, and it was concluded that this sixty-four year old man died after receiving bilateral pubic remi fractures and that said emboli in the lungs as well as venus emboli containing small fragments of marrow were presumably released from the bone at the fracture site.

The plaintiff testified about going to the hospital after being notified of her husband's injuries and about his condition at home that night. There was other testimony, including that of Alva Smithson, Medical Records Librarian at the Nashville General Hospital, but the only medical expert to testify was Doctor Steven Butler.

Doctor Butler was called by the plaintiff as a witness and explained the procedures that he followed upon examination of the patient, stating that his attention was directed in the Emergency Room to the site of the pain as complained of by the pa-

tient, and that this pain, being located in the lower back, caused him to look for damage to the spine and to overlook evidence of fractures of the pelvis.

He stated as follows:

"Primarily, treatment for a pubic rami fracture such as we are talking about here this morning is pain relief. You cannot anticoagulate these people. If you anticoagulate them, they will hemorrhage in their pelvis. It is a two-horned dilemma. You have a fracture of a major bone and it has a high risk of a pulmonary embolus in a person this age. Fifteen percent of them will die of embolus, if you coagulate them they will bleed to death. If someone comes in with a clot in a calf, you can anticoagulate them. In this man if you anticoagulate him, you would have caused him to bleed to death. Treatment of pain and early immobilization as soon as possible—"

In answer to the question as to what his treatment would have been had he discovered the fractures of the pelvis on the day the patient was first seen, he stated:

"I think the treatment I would have given would be exactly the same he received once he got in the hospital."

It is argued by counsel for the plaintiff that if the Doctor had discovered the fractured pelvis and had kept the patient in the hospital instead of sending him home, and, thus, subjecting him to movement to and from the hospital, the chances of his death from emboli and bone marrow in the vital organs would have been greatly decreased or entirely prevented and that the negligence of the Doctor in failing to discover the fractured pelvis on examination of the X-ray pictures was the cause of death or an approximate contributing cause thereof.

In testifying about the emboli and bone marrow moving through the circulatory system and causing death, Doctor Butler stated that this was a common occurrence where there is a major bone fracture. On cross-examination, he was asked and answered as follows:

"Q. So, there was nothing that could have been done or given to him that would have prevented the development of embolus?

A. No, sir.

Q. All right. Now, Doctor, the fact that he was allowed to go home and was confined at his home in bed there, did that in any way increase the risk of any embolus developing?

A. No, sir.

Q. Does movement or weight bearing have anything to do with the development of an embolus?

A. It is just the opposite. Fifteen years ago, if you remember, ladies had a baby and they put them to bed for weeks. A good portion of the ladies were developing pulmonary embolus because of bed rest. One of the biggest things since 1955 is— if you have ever been operated on the next post-operative day the doctor is pulling you out of bed to make you walk, that is to prevent pulmonary embolus, blood clots, et cetera."

At another point he testified that there was nothing that could have been done to have prevented the formation and release of the emboli and the marrow from the site of the fracture and that his being sent home was in no sense the cause of his death.

As stated hereinabove, Doctor Butler was the only medical expert to testify in this case. Thus, we have no evidence in the record from which the Court and the jury might be justified in finding that the failure to discover the fractured pelvis on the 25th of September was the cause of, or proximate contributing factor to the death of the patient on the 26th.

It is argued by counsel for the plaintiff that it is a matter of common knowledge that exercise, pain and excitement accelerates the pulse and the flow of blood through the circulatory system and that the plaintiff is entitled to the inference that her husband died because proper medical intervention did not occur in time to treat a serious condition from which he was suffering, and it is argued that if the patient had been properly treated when he arrived at the hospital on the 25th and that the Doctor had discovered the broken pelvis, as he should have done, the fat emboli and bone marrow and clots would not have moved through the circulatory system into the lungs, heart and other organs, thus causing his death.

█ Unfortunately for the plaintiff, this is an area in which a lay person is not qualified to testify. In order to maintain this position, some affirmative evidence of an expert in the field is required. There is none in this record.

For cases dealing with this subject, see Redwood v. Raskind, 49 Tenn.App. 69, 76, 350 S.W.2d 414, where it was said that, in actions for malpractice, there is no presumption of negligence on the mere failure of judgment or treatment or from the fact that the treatment has been unsuccessful, and that in malpractice cases involving the skill of a physician, the case must be controlled exclusively by expert testimony. Of course, Redwood does not stand for the proposition that in all malpractice cases without exception no jury question can arise without expert testimony. This is true because in some instances the matter may be regarded as being within the common knowledge of laymen such as the leaving of a sponge in the patient's body after an operation. Rural Educational Assn. v. Bush, 42 Tenn.App. 34, 298 S.W.2d 761; Prosser on Torts, § 32, p. 164 (4th Ed.)

█ However, in most instances the jury is not qualified to determine what is proper care in medical matters without expert testimony.

In Floyd et al. v. Walls, 26 Tenn.App. 151, 168 S.W.2d 602, it was held:

"A physician does not guarantee the cure of his patients, but after a careful diagnosis, a physician is not liable for damages resulting to his patient from an honest mistake in determining the character of treatment to be administered or in determining the necessity of an operation."

"In malpractice action, whether physicians' failure to take X-ray pictures of patient's back, which would have revealed an injury to his fourth lumbar vertebra was negligence, was not for jury but was to be determined upon expert testimony."

Also see Quinley v. Cocke et al., 183 Tenn. 428, 192 S.W.2d 992, and Butler v. Molinski, 198 Tenn. 124, 277 S.W.2d 448.

Under this disposition of the case, we do not find it necessary to consider the question of the alleged negligence of defendant or the relationship of master and servant, or principal and agent, which is raised by counsel for defendant concerning the relationship of Doctor Steven Butler to Vanderbilt University and the Nashville General Hospital.

Under all the facts shown by this record we are of opinion that the Trial Judge did not commit error in directing a verdict for the defendant.

Affirmed.

TODD and DROWOTA, JJ., concur.