Robert I. WARD and Ruth Ward,
Plaintiffs–Appellants,
Cross–Appellees,

v.

UNITED STATES of America,
Defendant–Appellee,
Cross–Appellant.

Nos. 86–5978, 86–5979 and 86–6122.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 10, 1987.

Decided Feb. 3, 1988.

Wayne Taylor, Omer and Taylor, James R. Omer (argued), Nashville, Tenn., for plaintiffs-appellants, cross-appellees.

W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., Joe Dycus, for defendant-appellee, cross-appellant.

Before JONES and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Plaintiffs Robert I. Ward and Ruth Ward, husband and wife, appeal the judgment of the district court for the defendant in this Federal Tort Claims Act case brought for the alleged medical malpractice of a surgeon-employee of defendant. Plaintiffs contend that the district court was clearly erroneous in finding that plaintiffs had not proved by a preponderance of the evidence that the surgeon performed surgery contrary to the applicable standard of care. Plaintiffs also allege error by the district court in admitting into evidence and relying on certain medical journal articles that were relied on by expert witnesses, in disqualifying one of plaintiffs' witnesses as an expert on the applicable standard of care, and in failing to give plaintiffs the benefit of the presumption of defendant's negligence under Tenn.Code Ann. 29–26–115(c).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Because we find no error in fact or law by the district court, we affirm the judgment for the defendant.[1]

Plaintiff Robert Ward brought his action for personal injuries against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq. Mrs. Ward filed her action for loss of services and consortium and for the value of her nursing care. The two actions were consolidated for trial. Plaintiffs allege that on January 9, 1978, Dr. C. Allen Ruleman, Jr.,

---

1. Defendant cross-appeals the finding of the district court that plaintiffs timely filed their administrative tort claim. Because we affirm the judgment for defendant on the liability issue, we need not address the statute of limitations issue.

a surgeon at the Veterans Administration Medical Center in Memphis, Tennessee, was negligent in that he breached the applicable standard of care when he unintentionally injected Teflon (polytetrafluoroethylene) paste into Mr. Ward's carotid artery, causing Mr. Ward to suffer a cerebrovascular accident or stroke.

At the time of the alleged malpractice, Mr. Ward was undergoing a procedure known as a Teflon injection of the nasopharynx to treat his patent (open) eustachian tube. The procedure involves using a Bruning syringe to inject Teflon paste in the area of the nasopharynx, causing the eustachian tubes to close partially. The operation report showed that the surgery, under general anesthesia, began at 9:15 a.m., with the actual operation going from 9:25 a.m. to 9:50 a.m. Mr. Ward was taken to the recovery room in a drowsy condition, but responded to verbal stimuli. By 12:30 a.m. the next morning, Mr. Ward could not move his right arm or leg and the right side of his mouth was drooping. He could not talk. At this time, doctors suspected a stroke. Subsequent medical tests confirmed this diagnosis.

## I. The Standard of Care

The liability of the United States in actions under the Federal Tort Claims Act is governed by the law of the place where the alleged tort occurred. 28 U.S.C. §§ 1346(b), 2674. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). All of the acts in this case occurred in Tennessee; therefore Tenn. Code Ann. § 29–26–115, which governs liability of medical personnel, is controlling.[2] On the first day of trial, the parties stipulated that Dr. Ruleman had injected the Teflon paste into the artery, and that the injection was the proximate cause of Mr. Ward's stroke. Therefore, the only issue regarding liability to be decided at trial was the negligence of Dr. Ruleman, in other words, whether he breached the applicable standard of care.

Tenn.Code Ann. § 29–26–115 provides:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

(c) In a malpractice action as described in subsection (a) of this section there shall be no presumption of negligence on the part of the defendant. Provided, however, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that

---

**2.** Plaintiffs complain that the district court relied on Tennessee cases decided before this statute became effective on July 1, 1975. However, the Tennessee Supreme Court has stated that this statute is a codification of the common law elements of negligence, *Cardwell v. Bechtol*, 724

S.W.2d 739, 753 (Tenn.1987), and Tennessee cases applying the statute give precedential effect to pre-statute cases. *See, e.g., German v. Nichopoulus*, 577 S.W.2d 197 (Tenn.Ct.App. 1978).

the instrumentality causing injury was in the defendant (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

(d) In a malpractice action as described in subsection (a) of this section, the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant. The jury shall be further instructed that injury alone does not raise a presumption of the defendant's negligence.

Plaintiffs had the burden to prove by a preponderance of the evidence the recognized standard of care in the community regarding the Teflon injection procedure by ear, nose, and throat (ENT) surgeons. Plaintiffs also had the burden to prove that Dr. Ruleman deviated from this standard and was, therefore, negligent. Plaintiffs' evidence regarding the standard of care consisted of the testimony, by deposition, of Perry Felton Harris, M.D., John J. Shea, M.D., and Howard Kirshner, M.D. As discussed below, Dr. Kirshner was later disqualified by the court as an expert on the standard of care.

Dr. Harris, a board certified otolaryngologist, testified that he had performed the Teflon injection procedure from 1970 or 1971 to 1985. He performed this procedure in a manner similar to the one used by Dr. Ruleman on Mr. Ward. Dr. Harris injects the needle to a depth of only one and a half to two millimeters under the mucous membrane. He uses a special syringe with a bulb on it that prevents him from injecting deeper; but in 1978, at the time of Mr. Ward's surgery, this syringe was not available. Dr. Harris testified that he assumed that Dr. Ruleman's use of a plastic sleeve on the syringe was an attempt to prevent the injection from going too deeply. Dr. Harris noted that such a sleeve could be put on the needle, "and try to hold it in a fashion whereby you couldn't go but two or three or four or five millimeters." Joint Appendix (JA) at 85. He testified that if you inject too deeply, the carotid artery might be penetrated. He stated that the carotid artery is at different depths in dif-

ferent people and that he did not know how close Mr. Ward's artery was to the injection site. Furthermore, only an autopsy could reveal this information. Anatomically, the artery "would be anywhere from four or five millimeters to maybe a half-inch or thereabouts" from the injection site. JA at 70.

Dr. Harris testified that the standard of care in performing this surgery was "to inject the Teflon into the anterior and inferior portion of the eustachian tube to render it partially closed or no longer patent, and, in so doing, not injecting either into the adjacent carotid artery or so near it that it should be blocked." JA at 40. He opined that Dr. Ruleman had not deviated from the standard of care by doing the procedure in the manner he did, or in the amount of Teflon paste that he injected, but that he did deviate by blocking the artery. Dr. Harris stated he was led to this conclusion "[b]ecause of the stroke the man had." JA at 75.

Dr. Shea, a world famous otologist, testified that he had also done this procedure. His method involved doing the procedure through the nose, rather than through the mouth by raising the soft palate with a retractor as Dr. Ruleman had done. Dr. Shea was of the opinion that his was the only safe and reliable method, but that not everyone in Memphis knew or should have known this. He also testified that in his opinion, it is beneath the standard of care to inject Teflon paste into the artery regardless of the method used.

Two articles written by Jack L. Pulec, M.D., were attached to Dr. Shea's deposition by counsel for defendant as exhibits 3 and 4. Dr. Shea had referred to these articles in his direct testimony and stated these articles were authoritative. In one of the articles, Dr. Pulec stated that the Teflon procedure can usually be done with the patient awake sitting in a chair, either lifting the palate, or going through the nostril. Dr. Pulec also wrote that:

In most cases this procedure can be done with the patient sitting in the chair and awake (Fig. 6), although occasionally the

palate cannot be elevated sufficiently. For these patients it is desirable to place the needle through the nostril on the involved side and guide its placement accurately into the tissue just anterior to the eustachian tube orifice by observing the area through a nasopharyngoscope placed through the other nostril.

Occasionally general anesthesia is necessary. The Yankauer speculum is stronger and seems to be better when general anesthesia is used. The injection is made 0.5 cm. anterior and 0.5 cm. inferior to the nasopharyngeal orifice of the eustachian tube (Fig. 7). The tip of the needle is thrust into the tissue for approximately 0.5 cm.; this is the area of the levator palatine muscle. The injection is delayed for a few moments and the area of the injection observed to make sure that there is no flow of blood from around the tip of the needle, indicating perforation of a large vessel. Then 0.75 to 1.5 ml. of paste is injected.

JA 475–76 (exhibit 3: Pulec & Hahn, *The Abnormally Patulous Eustachian Tube,* Otolaryngolic Clinics of North America, 131, 136–37 (Feb. 1970)).

Dr. Ruleman testified that he had assisted Dr. Charles Gross, the head of the otolaryngology residency program at the University of Tennessee, in the Teflon injection procedure on at least two prior occasions, one of them under general anesthesia. The night before he did the surgery, Dr. Ruleman reread Pulec's articles. Dr. Ruleman testified that Mr. Ward's deviated septum prevented him from doing the procedure through his nose, and the structure of his palate would have required too much pressure to retract it under local anesthesia; therefore, the injection was made through the mouth under general anesthesia. Dr. Ruleman detailed how he did the surgery, including putting plastic tubing on the needle to insure that he did not go deeper than 5 millimeters and following the procedure outlined in the Pulec articles. He testified that the standard of care at the time of Mr. Ward's surgery was that described by Dr. Pulec in his articles and taught by Dr. Gross, and that he had performed the surgery within this standard of

care. Dr. Ruleman also testified that at the time of the surgery, there was no report in the medical literature of the possibility of strokes or other severe side effects from the procedure.

The district court found that at the time of Ward's surgery in 1978, Dr. Ruleman was a well-qualified ENT surgeon. The court also found that Pulec's articles described the national standard of care for performing the Teflon injection procedure. The district court found that Dr. Ruleman injected at the correct site, at the correct depth, with the correct amount of paste, and checked for blood or swelling after inserting the needle to be sure that an artery had not been penetrated.

The court concluded that the plaintiffs had not carried their burden of proof regarding Dr. Ruleman's negligence and found that Mr. Ward's stroke was the result of a complication of the procedure. The court stated:

> It is not enough to find that the plaintiffs have carried their burden of proof to say that injection into the artery is a breach of the standard of care and that every time a physician injects into the artery, despite the best of care and caution, that is a violation of the standard. To say that the standard is "not to inject into the artery" is to say that a physician should guarantee his results, and that is not the law in medical malpractice cases.

JA at 2.

■ This analysis is correct. Under Tennessee law, a physician's duty is to exercise reasonable care and diligence. He must exercise his best judgment regarding treatment, and is not guilty of malpractice if he chooses a course of treatment supported by other physicians in good standing. *Truan v. Smith,* 578 S.W.2d 73, 75–76 (Tenn.1979). A physician is not the insuror of the patient; he is only liable for negligence, and negligence is not presumed from the fact that the treatment is unsuccessful. Liability for malpractice depends on whether or not the physician is lacking in and fails to exercise the reasonable degree of learning, skill, and experience that

is ordinarily possessed by others of his profession. *Watkins v. United States*, 482 F.Supp. 1006, 1012 (M.D.Tenn.1980).

█ There is no presumption of negligence; rather, the law presumes the physician has discharged his full duty. *Redwood v. Raskind*, 49 Tenn.App. 69, 350 S.W.2d 414 (1961). Moreover, negligence may not be presumed from the mere fact of injury. *Johnson v. Lawrence*, 720 S.W.2d 50, 56 (Tenn.Ct.App.1986). An honest mistake in judgment is not sufficient to find a physician negligent. *Perkins v. Park View Hosp.*, 61 Tenn.App. 458, 456 S.W.2d 276 (1970).

█ In determining the degree of learning and skill required of a medical practitioner in the treatment of a particular case, regard must be given to the state of medical science at the time. *Ogle v. Noe*, 6 Tenn.App. 485 (1927). "Evaluation of professional judgment must be based upon the facts available to the professional and the accepted practice among members of the profession under such facts." *Perkins*, 61 Tenn.App. at 482–83, 456 S.W.2d at 287.

█ The district court's finding that Dr. Ruleman performed the procedure in a manner well-recognized and accepted in January 1978 and exercised the care required to meet the standards of the specialty, was not clearly erroneous.

## II. Medical Articles as Evidence

The plaintiffs contend that the district court erred when it read and relied on Dr. Pulec's articles in establishing the applicable standard of care. These articles were referred to by Dr. Shea on direct examination and marked by defendant's counsel as exhibits 3 and 4 to Dr. Shea's deposition. Although Federal Rule of Evidence 803(18) precludes learned treatises from being received as exhibits, the Rule provides that treatises can be read into evidence. It appears that plaintiffs' counsel has confused the concept of not being received as exhibits with not being received as evidence.

█ Furthermore, Federal Rule of Evidence 103 provides that, in order to be error, a ruling admitting evidence must affect a substantial right of the party and a timely objection or motion to strike must appear on the record. On the second day of the trial, the court announced that it had read the depositions submitted and that court time need not be taken by reading them into the record. At this time, counsel for defendant objected to specific statements in the depositions submitted by plaintiffs, and the court ruled on those objections. Plaintiffs failed to object at this time, and never objected to the court's reading of the exhibits until this appeal. Moreover, plaintiffs have not shown that a substantial right was violated. The articles were relied upon by Dr. Ruleman, referred to by Dr. Kirshner, identified by Dr. Harris, discussed and quoted from by Dr. Shea, and generally recognized by the expert witnesses as the most important papers regarding the technique used on Mr. Ward.

█ Plaintiffs argue that because state law governs the competency of witnesses under Federal Rule of Evidence 601, the articles cannot be relied upon to establish the standard of care because Dr. Pulec would be incompetent to testify to the standard of care under the locality rule of Tenn.Code Ann. § 29–26–115(b). Even assuming, arguendo, that plaintiffs are correct in this contention, the short answer is that Dr. Pulec was not offered as a witness. Furthermore, these articles were incorporated into the testimony of Drs. Shea and Ruleman, who are competent to testify under the state statute. Considering all of the above, it was not reversible error for the district court to read and rely on the articles regarding the issue of the standard of care.

## III. Disqualification of Expert Witness

On the second day of trial, the district court ruled that plaintiffs had not qualified Dr. Kirshner, a neurologist and not an ENT surgeon, as an expert to testify to the standard of care for performing this type of ENT surgery. During the taking of Dr. Kirshner's deposition, counsel for defendant objected to Kirshner's testimony on the standard of care on the grounds that he was not qualified to give such an opinion.

The parties make an issue as to whether Federal Rules of Evidence 601 or 702 applies to the court's determination.

Plaintiffs argue that under Federal Rule of Evidence 601, when state law provides the substantive law, competency of witnesses is also determined by state law. *See Crumley v. Memorial Hosp.*, 509 F.Supp. 531, 532 n. 2 (E.D.Tenn.1978) (in diversity based medical malpractice action, competency of physician as expert witness is to be determined in accordance with Tennessee law), *aff'd*, 647 F.2d 164 (6th Cir.1981) (unpublished opinion). *See also LeMaire v. United States*, 826 F.2d 949, 954 (10th Cir.1987) (state law regarding competency of physician's testimony applicable to medical malpractice case brought under Federal Tort Claims Act). Defendant argues that Federal Rule of Evidence 702 governs expert testimony and that state law is inapplicable. *See Dawsey v. Olin Corp.*, 782 F.2d 1254, 1262 (5th Cir.1986) (under Fed.R.Evid. 1101 and 702, state statute preventing unlicensed physicians from testifying as medical experts inapplicable in diversity action in federal court).

■ We need not decide this issue because plaintiffs failed to show that this evidentiary ruling affected a substantial right as required by Federal Rule of Evidence 103(a)(1). Furthermore, the court stated that Dr. Kirshner's testimony on the standard of care did not add anything to the record. Kirshner testified that he was not "an expert about precise standards for that particular operation." JA at 158. His testimony was to the effect that it was never acceptable for any doctor to inject Teflon into the carotid artery. Therefore, we determine that no error was committed by the district court.

## IV. Rebuttable Presumption

■ Federal Rule of Evidence 302 provides that state law determines presumptions when state law provides the rule of decision. Plaintiffs contend that the district court erred in failing to give them the benefit of the rebuttable presumption of defendant's negligence available in Tenn. Code Ann. § 29-26-115(c) when the instru-

mentality is in the exclusive control of the defendant and the injury ordinarily does not occur in the absence of negligence. The presumption codified in § 29-26-115(c) is the doctrine of res ipsa loquitur. This doctrine is not ordinarily applicable to medical malpractice cases. *German v. Nichopoulos*, 577 S.W.2d 197 (Tenn.Ct.App. 1978). "This is true because neither lay people nor Courts possess reliable common knowledge in such technical matters. Therefore, expert testimony regarding the standard of care or duty in order to show negligence is required." *Id.* at 202. Here, the proper procedure to use in injecting Teflon is clearly not within common knowledge of a lay person and res ipsa loquitur does not apply. *See Perkins v. Park View Hosp.*, 61 Tenn.App. 458, 456 S.W.2d 276 (1970). Furthermore, there was no proof at trial that the injury would not have occurred in the absence of negligence. Even when all due care is exercised, this injury could still occur. *See Johnson v. Lawrence*, 720 S.W.2d 50, 56 (Tenn.Ct.App. 1986) (failure of plaintiff to show that stroke ordinarily does not occur in absence of negligence precluded plaintiff's reliance on statutory presumption of negligence).

■ Moreover, the doctrine is not applied when evidence is offered by plaintiff of specific acts of negligence. *Hughes v. Hastings*, 225 Tenn. 386, 469 S.W.2d 378 (1971). In the present case, plaintiffs presented extensive evidence on the issue of negligence of Dr. Ruleman. Therefore, it is clear that this case is not appropriate for the application of the presumption found in § 29-26-115(c).

For the foregoing reasons, we AFFIRM the district court's judgment for defendant based on the plaintiffs' failure to carry their burden of proof regarding the defendant's breach of the standard of care.